IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| METASWITCH NETWORKS LTD. | § § | |
| v. | § § | Case No. 2:14-cv-744-JRG-RSP |
| GENBAND US LLC, ET AL. | § § | |

**MEMORANDUM ORDER**

Before the Court is a Motion to Exclude Certain Opinions of Metaswitch's Damages Expert Mr. Raymond S. Sims filed by Genband US LLC ("Genband"). (Dkt. No. 181; "Motion to Strike"). Also before the Court is Genband's Motion to Exclude Opinions of Mr. Sims contained in his Addendum Report. (Dkt. No. 277; "Motion to Strike Addendum Report"). Metaswitch Networks Ltd. ("Metaswitch") opposes these Motions.

**I. LAW**

**A. Rule 702**

Rule 702 permits an expert witness to offer opinion testimony if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

"The inquiry envisioned by Rule 702 is . . . a flexible one," but, in *Daubert*, the Supreme Court held that the Rules also "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993); *see also Apple Inc. v. Motorola, Inc.*,

757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.").

"The relevance prong [of *Daubert*] requires the proponent [of the expert testimony] to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis*, 174 F.3d at 668).

In assessing the "reliability" of an expert's opinion, the trial court may consider a list of factors including: "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards," and "general acceptance" of a theory in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"); *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

"The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

**B. Damages**

Upon a finding of infringement, a patent holder is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . [unless] the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, proof of damages must be carefully tied to "the claimed invention's footprint in the market place." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014); *CSIRO v. Cisco Sys.*, 809 F.3d 1295 (Fed. Cir. 2015) ("damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more").

"[E]stimating a 'reasonable royalty' is not an exact science. As such, the record may support a range of 'reasonable' royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). In determining whether to admit or exclude a damages opinion under Rule 702, "[t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

**C. Timely Disclosure**

A party must disclose the opinions of its experts "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). A party who fails to timely disclose bears the burden of proving that such failure is harmless. *See Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th

Cir. Tex. 1999). A court considers four factors to determine whether a Rule 26 violation is harmless: "(1) [the party's] explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to [the opposing party] in allowing the evidence, and (4) the availability of a continuance." *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009).

## II. ANALYSIS

Mr. Sims is Metaswitch's damages expert. His opening expert report was served September 2, 2015. (Dkt. No. 181-2; "Report"). His Addendum Expert Report was served February 19, 2016. (Dkt. No. 277-3; "Addendum").

### A. Motion to Strike Mr. Sims's Opening Report

Genband moves to strike two categories of opinions in Mr. Sims's Opening Report. *First*, Mr. Sims's damages opinions for Patent No. 6,807,273 (the '273 Patent) applying a "cost approach" that compares the cost of using the patented technology with the cost of implementing "the next-best acceptable non-infringing alternative." *See* Report at 33.[1] *Second*, Mr. Sims's damages opinions for Patent Nos. 6,816,482 (the '482 Patent) and 7,881,282 (the '282 Patent) that apply an "analytical approach" which "presumes that the value of a patent and a reasonable royalty is the difference between the profits earned on the patented product and the standard industry profits earned on products not covered by the patent-in-suit." *See* Report at 31.

#### 1. The '273 Patent

Genband challenges Mr. Sims's '273 Patent damages opinions on several grounds. The first of these grounds is a challenge to his overall methodology, arguing it runs afoul of the entire market value rule ("EMVR"). (Dkt. No. 181 at 6–8). Specifically, Genband argues that Mr. Sims

---

[1] Citations to the docket, including to Mr. Sims's Report and Addendum, use the page number reflected in the CM/ECF header.

inappropriately relies on the entire cost of implementing a non-infringing alternative to the '273 Patent—migrating subscriber lines from old line frame equipment to new equipment. According to Genband, this opinion violates the entire market value rule because upgrading line frames provides benefits other than those attributable to the '273 Patent, such as electricity cost savings and "access to enhanced applications and services." (Dkt. No. 181 at 8). Thus Genband contends Mr. Sims has not apportioned his damages analysis to encompass only the incremental value of the invention.

Mr. Sims's opinion is based on the theory that upgrading line frames is the "next best alternative" to practicing the '273 Patent. Report at 34. Mr. Sims cites the expert report of Dr. Burger as support for this proposition. *Id.* Metaswitch also cites a Genband document that characterizes "complete line migration" as the "next-best-alternative" to the CS1500 product. (Dkt. No. 197-10 at 8). Based on the premise that upgrading line frames is the next best alternative, Mr. Sims attributes the value of the patent to the difference between the cost of practicing the patent and the cost he has calculated for transitioning to this alternative. Report at 36–37.

Mr. Sims's methodology does not run afoul of the entire market value rule because it attempts to isolate the incremental value that Genband would ascribe to the patented features, and not more. If upgrading line frames is in fact the "next best" alternative to the '273 Patent, then the cost of implementing that alternative is equivalent to the cost of avoiding infringement. The fact that one might be motivated to upgrade for reasons unrelated to infringement, or that one might obtain additional benefits from upgrading, does not mean that this methodology incorporates the value of unpatented features. *See* Report at 33 ("all other things equal, the profits would be lower by the amount of the cost savings if the alternative to the patent were implemented and, therefore, those cost savings represent the portion of the profits directly attributable to the patent(s)"). The cost savings of the patent over the next best alternative way to obtain the same results represents

the savings the patent provides to one who practices it, and is therefore a sufficiently reliable measure of the incremental value of the patent. *See Powell v. Home Depot U.S.A.*, Inc., 663 F.3d 1221, 1240 (Fed. Cir. 2011) ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty."). Mr. Sims's cost approach is therefore based on sufficiently reliable principles and is admissible under Rule 702.

Genband also takes issue with Mr. Sims's inclusion of ongoing costs because this figure is derived from a Genband document and not based on the opinion of Metaswitch's technical expert. (*Id.* at 7–8). There is nothing inappropriate about Mr. Sims basing a portion of his opinion on Genband documents reflecting cost estimates. Genband offers no reason why an economist would not consider and rely on these estimates.

Genband also argues that Mr. Sims's royalty calculation is unreliable because he assumes that "all 354 C15 units sold in the U.S. are included in the royalty base." Genband contends that at most 271 C15 installations fall within the scope of Metaswitch's infringement contentions because the other 83 C15s are not connected to line frames. (Dkt. No. 181 at 9). Genband clarifies in its Reply that this "is not a Genband non-infringement position" but is based on Dr. Sims's statement in his report that "C15s connected to the line frames of DMS switches" are accused. (Dkt. No. 212 at 5–6); *see also* Report at 73.

Mr. Sims is not a technical expert, and he does not say that the <u>only</u> accused or infringing C15s are those connected to the line frames of DMS switches. Genband does not cite the opinion of any technical expert to support its contention that not all C15s are connected to the line frames of DMS switches or that any such unconnected C15s do not infringe. Mr. Sims does cite evidence that the C15 "is strategically positioned in the market based on the cost savings associated with its ability to interface with legacy switch line frames" and thereby concludes it is appropriate to

6

include all C15 units in the royalty base. Report at 73–74. Whether all C15s are actually connected to line frames, and whether such connection is required to infringe, is fundamentally a fact dispute and not a *Daubert* issue. To be entitled to damages, Metaswitch must meet its burden to prove infringement. And Genband is free to argue that some or all C15s do not infringe. Genband is also free to cross-examine Mr. Sims about his support for his royalty base. However, Mr. Sims's methodology for selecting a royalty base is rooted in evidence and economic reasoning; it is therefore sufficiently reliable under Rule 702.

Finally, Genband argues Mr. Sims has inappropriately included in his royalty base C15 or C1500 units that were sold by Nortel (not Genband) between 2008 and May 2010. (Dkt. No. 181 at 10). Metaswitch responds that not just sale, but also <u>use</u> of infringing products can give rise to liability for infringement, and that "the actions of repair and maintenance have been included among the list of affirmative acts which may lead to liability for inducement" because repair and maintenance tend to perpetuate infringing use. *See Nuance Communs. Inc. v. Tellme Networks, Inc.*, 707 F. Supp. 2d 472, 486 n.17 (D. Del. 2010) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 (1964)). Metaswitch also argues that Genband is liable for direct infringement arising out of "repair," "maintenance," and "training" activities in connection with the Nortel products, arguing this qualifies as infringing "use." (Dkt. No. 197 at 15).[2] Accordingly, it is not a violation for Rule 702 for Mr. Sims to include the Nortel units in his royalty base and to assign the same measure of damages for these units (since his damages are based on the cost Genband would need to pay to cease or avoid infringement). Of course, Metaswitch will need to prove that Genband infringes, directly or indirectly, with respect to the

---

[2] Metaswitch also argues Genband could be jointly liable, or liable as a successor, for Nortel's allegedly infringing sales. At the February 22, 2016 pretrial conference, Metaswitch represented it would not pursue a theory of "successor liability," so the Court does not consider this theory.

units sold by Nortel. But this is a liability fact question, and not a *Daubert* issue.

For the foregoing reasons, the Court declines to strike the damages of opinions of Mr. Sims for the '273 Patent.

Additionally, this ruling bears on Genband's Motion in Limine No. 14, which asks the Court to "[e]xclude evidence or argument suggesting that the jury should award damages for sales or other activities of Nortel or uReach." (Dkt. No. 289 at 14). Because Metaswitch has represented that it is not pursuing a theory of successor liability, this Motion is **GRANTED**. However, Metaswitch is not precluded from arguing that Genband is liable for direct or indirect infringement arising from the "use" of accused products originally sold by a third party such as Nortel or uReach.

2. The '482 and '282 Patents

Genband also moves to strike Mr. Sims's damages opinions for the '482 and '282 Patents. (Dkt. No. 181 at 18–19). For these patents, Mr. Sims employs the "analytical approach," which "presumes that the value of a patent and a reasonable royalty is the difference between the profits earned on the patented product and the standard industry profits earned on products not covered by the patent-in-suit." Report at 31. Genband argues that Mr. Sims's analysis does not compare the profit for the accused products to "standard industry profits," but instead compares the profitability of the accused products to Genband's un-accused G9 product. Genband also argues that Mr. Sims's analysis runs afoul of the EMVR because it "appl[ies] an 8% royalty rate to all revenues from the accused products." (Dkt. No. 181 at 19). Genband contends that Mr. Sims "fails to consider the economic differences [between the accused and un-accused products] that affect profitability and that are not even allegedly attributable to the patents." (*Id.*).

The "analytical approach" has been accepted by the Federal Circuit as one way to calculate

a reasonable royalty. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). The analytical approach in *TWM* was applied by subtracting "the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices." *Id.* The difference between the standard profit an infringer can expect to obtain from the sale of non-patented articles and the profit it obtains from the sale of a patented article should, *ceteris paribus*, be equal to the profit attributable to the patented features.

Although Mr. Sims uses the phrase "standard industry profits" in his broad-strokes characterization of the analytical approach, there is nothing about the analytical approach that precludes a comparison between the profit margins on specific products. Mr. Sims, relying on the technical opinions of Dr. Burger, opines that there are "only two material differences between the [accused] G2/G6 and the [un-accused] G9." Report at 32. First, the G9 has higher capacity and scale than the accused products; Mr. Sims opines that higher capacity would tend to increase the G9's profitability. *Id.* Second, the G2/G6 products allegedly practice the patents whereas the G9 does not. *Id.* Accordingly, Mr. Sims concludes that the difference in profitability between the accused G2/G6 and the un-accused G9 should be less than or equal to the value of the patents (because the higher capacity of the G9 tends to increase its profitability and thereby understate the value of the patented features). He opines that the difference in profit margins between these products is 8%, and states that this is a "conservative" measure of damages because "[i]f the greater capacity of the G9 were removed, the expectation would be that the difference in profitability between the G2/G6 and G9 would be even larger." *Id.*

Genband does not identify any specific flaws in this methodology. Genband cites references in Mr. Sims's report and in the *TWM* case to "industry standard profit" and "industry

9

standard net profit" as the point of comparison for an analytical approach, but Genband does not explain why comparing the profitability of specific products is somehow less reliable. (Dkt. No. 212 at 6). So long as the comparison isolates the value of the patented features—and no more—it is immaterial whether the profitability of a specific product or of an industry is used. Genband also faults Mr. Sims for failing to account for "different factors [that] affect the price of each product" but does not specify what these factors are. *Id.* Mr. Sims's analysis does account for the "only two" differences he and Dr. Burger have identified between the G2/G6 and the G9. Report at 32. Genband is free to cross-examine Mr. Sims about any other factors it believes he has not considered. Finally, the fact that Mr. Sims's analysis results in a valuation of the patent equal to 8% of the total revenue for the accused products does not mean he has run afoul of the EMVR, as Genband contends. Every damages number can be expressed mathematically as some percentage of total revenue. Mr. Sims's damages calculation does not rely on total revenue as a base, and instead attempts to apportion only the fraction of the profit margin of the accused products attributable to the patented features.

For the foregoing reasons, the Court declines to strike the damages of opinions of Mr. Sims for the '482 and '282 Patents.

**B. Motion to Strike Mr. Sims's Addendum Report**

Genband moves to strike Mr. Sims's opinions as to royalty rates contained in an Addendum Report served February 19, 2016. (Dkt. No. 277). Genband does not raise objections to the substance of Mr. Sims's opinions under Rule 702 and *Daubert*, but Genband argues the Addendum should be excluded as untimely.

In early February 2016, the parties agreed to exchange (and did exchange) supplemental sales and revenue information through December 31, 2015. (Dkt. No. 277-2). The parties also

agreed that their damages experts would serve supplemental reports based on this information. (*Id.*). The parties did not reach a "clear agreement about the contents of those reports," with Genband contending that any supplemental expert opinions should be limited to an adjustment of the royalty base but not the royalty rate. (*Id.* at 2, 8–9).

Because the parties did not move to amend the Court's Docket Control Order to permit late supplementation of expert reports, any such late reports are untimely under Rule 26. Fed. R. Civ. P. 26(a)(2)(D) (parties must disclose expert reports "at the times and in the sequence that the court orders") (emphasis added). Accordingly, the Court must consider whether the late disclosure is "harmless" under the Fifth Circuit's four-factor test: "(1) [the party's] explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to [the opposing party] in allowing the evidence, and (4) the availability of a continuance." *CQ, Inc.*, 565 F.3d at 280.

The fact that the parties mutually agreed to supplement their expert reports provides a satisfactory explanation for Metaswitch's failure to timely disclose and suggests that the parties considered the supplemental sales and revenue information sufficiently important to warrant late supplementation. Thus factors (1) and (2) weigh in favor of allowing Mr. Sims to supplement his report. That the supplemental reports were exchanged just a few weeks before trial renders a continuance not reasonably available, and factor (4) therefore weighs against allowing supplementation.

The key question is whether Mr. Sims's Addendum Report will cause substantial prejudice to Genband. Mr. Sims's Addendum Report does not appear to introduce any new methodologies, and Genband does not contend it does. However, because many of Mr. Sims's damages calculations rely on the cost of next-best alternatives or a comparison between the profit margins

on Genband products, the supplemental sales and revenue information the parties exchanged resulted in changes to Mr. Sims's estimated royalty rate (i.e. the royalty per product) in addition to his royalty base (i.e. the number of products sold) for three asserted patents. *See* (Dkt. No. 277 at 2–4). Genband argues this is improper because "Mr. Sims did not opine that the parties would have agreed to re-negotiate or alter the royalty rate" as new data became available. (*Id.* at 3). However, it is well-settled that post-hypothetical-negotiation evidence can act as a "book of wisdom" to inform the royalty rate the parties would have agreed to (and Mr. Sims's original report relied on data that post-dated the hypothetical negotiation). *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014). Genband does not articulate any specific prejudice other than the need to "conduct discovery" into the bases for Mr. Sims's new opinions. (Dkt. No. 277 at 5–6). But Mr. Sims's new opinions are based on Genband's financial data, and it is undisputed that his methodology has not changed. It is therefore unclear why additional discovery would be helpful. Finally, the fact that the parties agreed to exchange supplemental financial information and expert reports, while "agree[ing] to disagree" with respect to the details of what that supplementation would entail suggests the parties did not perceive a significant risk of prejudice. *See* (*Id.* at 4, 6).

Because Genband will suffer little if any prejudice, the Court declines to strike the Sims Addendum Report as untimely.

### III. CONCLUSION

In light of the foregoing, Genband's Motion to Strike (Dkt. No. 181) is **DENIED**. Genband's Motion to Strike the Addendum Report (Dkt. No. 277) is **DENIED**. Genband's Motion in Limine No. 14 is **GRANTED** to the extent set forth in Part II.A.2 above.

**SIGNED this 5th day of March, 2016.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE