# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| METASWITCH NETWORKS LTD, | § § § | CIVIL ACTION NO. 2:14-CV-00744-JRG |
| Plaintiff, | § § § | |
| v. | § § | |
| GENBAND US LLC, GENBAND MANAGEMENT SERVICES CORP., | § § § § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are the Parties' post-trial motions. Plaintiff Metaswitch Networks Ltd. ("Metaswitch") filed its Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for a New Trial (Dkt. No. 376). Defendants Genband U.S. LLC and Genband Management Services Corp. ("Genband") filed the following post-trial motions: (1) Genband's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Dkt. No. 377); and (2) Genband's Renewed Motion for Judgment as a Matter of Law on Issues Not Expressly Decided by the Jury and for Dismissal with Prejudice of Metaswitch's License Defenses (Dkt. No. 371).

Having considered the Parties' arguments and for the reasons set forth below, the Court **DENIES** Metaswitch's Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for a New Trial (Dkt. No. 376); the Court **DENIES** Genband's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Dkt. No. 377); and the Court **DENIES** Genband's Renewed Motion for Judgment as a Matter of Law on Issues Not Expressly Decided by the Jury and for Dismissal with Prejudice of Metaswitch's License Defenses (Dkt. No. 371).

## I.  BACKGROUND

On July 7, 2014, Metaswitch filed a complaint against Genband, alleging infringement of seven different patents: United States Patent Nos. 6,816,482 ("the '482 Patent"); 7,881,282 ("the '282 Patent"); 6,807,273 ("the '273 Patent"); 8,611,522 ("the '522 Patent"); 8,687,640 ("the '640 Patent"); 7,657,018 ("the '018 Patent"); and 8,488,768 ("the '768 Patent"). (Dkt. No. 1.)  Genband asserted certain counterclaims, which were amended on April 16, 2015, and which included infringement counterclaims as to five different patents: United States Patent Nos. 6,879,667 ("the '667 Patent"); 7,680,252 ("the '252 Patent"); 7,953,210 ("the '210 Patent"); 8,600,006 ("the '006 Patent"); and 7,162,024 ("the '024 Patent"). (Dkt. No. 75 at 26–51.) On July 20, 2015, the Court entered an order staying trial as to all non-patent counterclaims, and all the patent claims and counterclaims then proceeded to trial. (Dkt. No. 123 at 1.) At trial, Metaswitch asserted patent infringement of six patents and Genband counterclaimed asserting infringement as to four patents. (Dkt. No. 348.)

After a four-day trial, the jury reached a unanimous verdict finding non-infringement as to all of the combined fourteen claims presented by both parties and also finding invalidity as to each of the nine claims from where invalidity had been pled by either party. (Dkt. No. 348.)[1]

## II.  LEGAL STANDARDS

### A.  Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the

_____
[1] As Shakespeare's Mercutio might have said if he been a member of this jury, "A pox upon both your houses." William Shakespeare, *Romeo and Juliette*, Act 3, Sc. 1.

district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is entitled to judgment as a matter of law, "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Ellis v. Weasler Eng'g Inc.*,

258 F.3d 326, 337 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

### B.  Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). In considering a motion for a new trial, the Federal Circuit applies the law of the regional circuit. *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). The court can grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict," *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "[C]ourts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Perret v. Nationwide Mutual Ins. Co.*, Case Nos. 4:10-cv-522, 4:10-cv-523, 2013 WL 12099400, at *1 (E.D. Tex. July 19, 2013). *See also* Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d. § 2803 at 46–47 (1995). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)

# III.  METASWITCH'S RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW TRIAL

## A. Judgment as a Matter of Law for Infringement of the Asserted Claims of the '273 Patent

Metaswitch moves for judgment as a matter of law that Genband's accused products infringe Claims 18, 19, 24, and 27 of the '273 Patent. The invention claimed in the '273 Patent "relates generally to the field of telecommunications, particularly to digital switching systems used to route calls within telecommunication networks, and more particularly to a method for bypassing the common control and switch matrix of a digital switching system." '273 Patent at 1:10–14. Genband argues that a reasonable jury could reach the conclusion reflected in the verdict; i.e.: that Metaswitch failed to prove by a preponderance of the evidence that Genband's accused products do not include several of the limitations in the asserted claims, including the "line and trunk interfaces," "digital transmission facility," "media gateway," or "means for connecting." (Dkt. No. 383 at 1–2.)

### 1. "Line and trunk interface" (Claims 18, 19, 24)

Claim 18, from which Claims 19 and 24 depends, requires accessing internal signals used to control "line and trunk interfaces" of a class five digital switching system in a telecommunications network. '273 Patent at 14:36–50. During trial, Genband's expert, Dr. Brody, testified that the claimed "line and trunk interface" requires both a line interface and a trunk interface, and that the accused products only connect to line frames. (Dkt. No. 376 at 4.) From this explanation, Dr. Brody concluded that the accused products do not infringe Claims 18, 19, and 24 because the Genband products do not connect to "trunk interfaces of a class five digital switching system." (Dkt. No. 383 at 2.) Metaswitch argues that Dr. Brody's interpretation of the "line and trunk interface" limitation is contrary to the plain meaning of the claim language. (Dkt. No. 376 at 4.) Although Metaswitch did not raise "line and trunk interface" as a disputed term during the

claim construction process, Metaswitch now contends that "line and trunk" modifies "interface" such that a "line and trunk interface" is a single interface that can connect to lines and trunks. (Dkt. No. 376 at 4–5.) At trial, Metaswitch's expert testified that "line and trunk" modifies "interface" such that the claims are met by line interfaces, trunk interfaces, or both. (Dkt. No. 388 at 1.) Metaswitch notes that Genband's invalidity expert, Mr. Stillerman, agreed during his deposition that "line and trunk" modifies "interface" such that the claims are met by line interfaces, trunk interfaces, or both, and "only changed his testimony after a break with his attorney." (Dkt. No. 388 at 1.) In addition, Metaswitch argues that Genband's own corporate witness, Mr. O'Brien, "admitted that frames that allegedly only connect to lines in the accused products are described using both "line" and "trunk," consistent with Metaswitch's understanding of the claims." (Dkt. No. 388 at 1.) Accordingly, Metaswitch concludes that no reasonable jury could have relied on Dr. Brody's testimony. (Dkt. No. 388 at 1.)

However, Mr. Stillerman confirmed at his deposition, in his deposition errata, and at trial that he understands "line and trunk" to require both line interfaces and trunk interfaces. (Dkt. No. 383 at 3.) In addition, Mr. O'Brien's testimony was specifically referring to the "line/trunk" or just "line trunk" limitation of the asserted claims, not the "line and trunk" limitation of Claim 18, 19, and 24. (Dkt. No. 358 at 187:5–22; Dkt. No. 383 at 2–3.) Genband argues that a reasonable jury could find unpersuasive Metaswitch's argument that "line and trunk interfaces" can be met by line interfaces alone. (Dkt. No. 394 at 1.) The Court agrees with Genband. There is substantial evidence based on Dr. Brody's and Mr. Stillerman's testimony to support a jury's finding that the "line and trunk interfaces" were not met by line interfaces alone, and that as a result, Genband's accused products do not infringe Claims 18, 19, 24, and 27 of the '273 Patent. While Metaswitch's expert testified that the "line and trunk interfaces" limitation does not require both a line interface and a

trunk interface, the jury was entitled to credit Dr. Brody's and Mr. Stillerman's explanations and reject Metaswitch's argument that "line and trunk" modifies "interface" such that the claims are met by line interfaces, trunk interfaces, or both.

### 2. *"Digital transmission facility" (Claims 18, 19, 24, 27)*

Claims 18, 19, 24, and 27 of the '273 Patent also require a connection to a "digital transmission facility." '273 Patent at 14:36–16:25. Similar to the Parties' arguments about the "line and trunk interface" limitations, the Parties disagree on the "plain and ordinary" meaning of a "digital transmission facility." (Dkt. No. 383 at 3–4.) Metaswitch argues that the plain meaning of "digital transmission facility" is a facility that transmits digital data. (Dkt. No. 376 at 5.) However, Genband's expert, Dr. Brody, testified that in telecommunications, a facility transmits voice, and the limitation of a "digital transmission facility" as claimed in the '273 Patent must be limited to a facility that only carries voice. (Dkt. No. 359 at 21:12–23:7; Dkt. No. 358 at 187:23–188:13.) Under Genband's reasoning, the accused structures, including backplane connections, local cables, traces printed on a circuit board, and Ethernet switch fabric do not satisfy the facilities required by the claim because they lack a facility that only carries voice. (Dkt. No. 383 at 4–5.) Here, the jury was presented with more than adequate evidence upon which it could have concluded that Genband's C15, G2, and G6 products do not include a "digital transmission facility." "[W]here the parties and the district court elect to provide the jury only with the claim language itself, and do not provide an interpretation of the language in the light of the specification and the prosecution history, it is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Hewlett–Packard Co. v. Mustek Sys. Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003). Genband provided substantial evidence in the form of expert testimony that in the context of the patent the plain and ordinary meaning of "digital transmission facility" is limited to facilities transmitting voice. The

jury was entitled to weigh and consider the substantial evidence discussed above in favor of Genband. *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 697 (Fed. Cir. 2008).

### 3. "Media gateway" (Claim 24)

Claim 24 of the '273 Patent requires a "media gateway" to be "within the telecommunications network" and connected such that the media gateway can "communicate with the internal signals." '273 Patent at 15:19–24. The media gateway is connected to a digital transmission facility, which in turn connects to the switching system interface. *See* '273 Patent at 14:51–58 (Claim 19, upon which Claim 24 depends on, is a method that further comprises the step of establishing "a second connection between the digital transmission facility and the switching system interface"); *id.* at 15:19–24 (Claim 24 claims "[t]he method of . . . claim 19 further comprising the steps of connecting a media gateway within the telecommunications network to the second connection to enable the media gateway to communicate with the internal signals"). Metaswitch argues that the C15 product meets the "media gateway" limitation because the C15 port module, which is a single device, is both the "switching system interface" and "media gateway." (Dkt. No. 376 at 6–9; Dkt. No. 388 at 2.) Metaswitch similarly argues that the G2 and G6 products, which are individual devices, meet both the "switching system interface" and "media gateway" limitations. (Dkt. No. 376 at 6–9; Dkt. No. 388 at 2; Dkt. No. 356 at 43:13–44:4, 45:21–46:19.)

Genband's expert, Dr. Brody, testified that the switching system interface, the digital transmission facility, and the media gateway are distinct components of the network. (Dkt. No. 358 at 188:23–191:3.) ("Coming out of the switching system interface over the digital transmission facility are – is now the signaling and the voice, and that goes to the local terminal, and the local terminal in this case is a [media] gateway."). At trial, Genband argued that the accused products lack the claimed "media gateway" because Claim 24 requires a configuration in which the digital

transmission facility is connected between the switching system interface and media gateway. (Dkt. No. 383 at 6.) For example, Figure 3 of the '273 Patent illustrates an embodiment in which the media gateway is connected to the switching system through a digital transmission facility. (Dkt. No. 383 at 5.) While Claims 24 and 19 do not explicitly require the digital transmission facility to be located between the media gateway and the switching system interface, at the very least, there is substantial evidence in the form of testimony and the embodiments of the '273 Patent to support a reasonable jury's finding that the C15 port module, the G2, and the G6 are not both "media gateways" and "switching system interfaces."

### 4. "Means for connecting"

Claim 27 requires a "means for connecting the network interface to a digital transmission facility" within the telecommunications network. '273 Patent at 16:19–21. On August 10, 2015, this Court construed the term as a means-plus-function term for which the function is "connecting the network interface to a digital transmission facility" and the corresponding structure is "cables, digital transmission facilities, and equivalents thereof." (Dkt. No. 136 at 45–46.) Genband contends that the jury was presented at trial with substantial evidence from which it could reasonably find non-infringement of Claim 27 because Metaswitch's expert did not identify any cables, digital transmission facilities, or equivalents that connect the alleged network interface and a digital transmission facility within the network. (Dkt. No. 383 at 6.)

Metaswitch argues that its expert, Dr. Burger, testified that the C15 contains "the corresponding structure through the cables that are used to connect the port module to the LCM, and do the G2 and G6—thus infringing." (Dkt. No. 388 at 3) (citations omitted). Although, as Genband correctly points out, this testimony is related to "means for connecting . . . to at least one line/trunk interface," and not "means for connecting . . . to a digital transmission facility," Dr. Burger later testified that the C15, the G2, and the G6 are connected to a digital transmission

facility "us[ing] cables." (Dkt. No. 356 at 55–56) ("So, again, we have the network interface, the G2 and G6, and it's connected to a digital transmission facility – again, IP. And I may have neglected to mention for the C15, that IP – and they did say in the manual – uses cables. We have the structure as well."). Despite Dr. Burger's testimony, Genband's expert, Dr. Brody, stated that "Dr. Burger hasn't identified any cables, digital transmission facilities, or the equivalents that connect the network interface that he's identified to a digital transmission facility within the network." Considering this record, there is substantial evidence to support a reasonable jury's finding that Dr. Burger did not sufficiently identify the cables used to connect the network interface to a digital transmission facility in the C15, G2, and G5 products. Dr. Brody provided contrary testimony to that of Dr. Burger. However, the jury was in the best position to weigh the evidence and the credibility of the competing witnesses and as a result determine whether it found Dr. Brody or Dr. Burger to be more persuasive. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1045 (Fed. Cir. 2016) (*en banc*).

The Court denies Metaswitch's JMOL with respect to infringement of the '273 Patent.

### 5.Doctrine of Equivalents

An accused product that does not literally infringe a patent claim may nonetheless infringe under the doctrine of equivalents. The doctrine of equivalents is applied "as an objective inquiry on an element-by-element basis." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). "An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* (noting that the imprecision of the doctrine of equivalents standard is considerably reduced by "[a] focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements").

Metaswitch argues that the accused products infringe under the doctrine of equivalents because, as Dr. Burger testified, the accused products "are still performing the same function, that of bypassing the matrix and common control, that they're still using the line and trunk frames, and they're still getting the same result, being able to bring people from the legacy Class 5 network to the modern softswitch network and doing it at that capital-saving way—money-saving way of keeping those line/trunk frames." (Dkt. No. 376 at 9; Dkt. No. 356 at 69:8–20.) Genband's argues that Dr. Burger's testimony is a conclusory opinion that the accused products bypass the matrix and common control while still using line/trunk frames. (Dkt. No. 383 at 7.) Genband states that because Dr. Burger did not provide a limitation-by-limitation analysis of equivalence, a jury could have reasonably concluded that Metaswitch did not meet its burden under the doctrine of equivalents. (Dkt. No. 383 at 7.) The Court agrees. A reasonable jury could have concluded that Dr. Burger's testimony was not an adequate limitation-by-limitation analysis and was not sufficient to meet Metaswitch's burden of establishing infringement under the doctrine of equivalents. In addition, Genband presented substantial evidence rebutting Metaswitch's doctrine of equivalents argument upon which a reasonable jury could have relied. (Dkt. No. 394 at 3; Dkt. No. 358 at 193:17–194:12.)

### 6. Indirect Infringement

It is axiomatic that "[t]here can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement. . . ."). For the reasons discussed above, there is substantial evidence from which a reasonable jury could conclude

that Genband does not directly infringe the asserted claims of the '273 Patent, and accordingly, does not indirectly infringe the claims-at-issue. *See supra* Sections I.A.1–5.

Moreover, Genband presented substantial evidence that Genband did not believe it infringed the '273 Patent. Unlike direct infringement, "liability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926, 1930 (2015) (holding that a belief in noninfringement, but not invalidity, is a defense to indirect infringement). During trial, David Smith, Metaswitch's corporate representative and the inventor of the '273 Patent, testified that the first idea that he came up with for his company "is actually the subject of what we're here for today, but at the time, and for years afterwards, we called it a CAP5." (Dkt. No. 358 at 165:11–166:4.) Mr. Smith testified that when he discussed using CAP5 as a way of dealing with existing DMS line frames with Genband, one of Genband's employees was opposed to CAP5 because Genband allegedly had an alternative to CAP5. (Dkt. No. 385 at 171:15–172:4) ("A. The alternative was to bring DS30s out of the line frames to these—this new softswitch that they had acquired with Nortel, which was the CS 1500."). The jury is entitled to believe or disbelieve testimony presented to it. *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011). In this situation, it was not unreasonable for the jury to accept Mr. Smith's testimony and find that Genband did not have the scienter required for indirect infringement.

The Court denies Metaswitch's JMOL with respect to indirect infringement of the '273 Patent.

### B. Judgment as a Matter of Law for Infringement of the '482 or '282 Patents

Metaswitch argues that the undisputed evidence offered at trial showed that Genband's G2, G5, and G6 products directly and indirectly infringe Claims 6 and 7 of the '482 Patent and Claim 2 of the '282 Patent. (Dkt. No. 376 at 11.) The claimed inventions described in the '482 and the

'282 Patents generally relate to a system and methods for interfacing a broadband network and a circuit switched network. '282 Patent at 1:20–37, 7:37–8:39; '482 Patent at 1:13–31, 8:28–50.

### 1. *"Positioned between" configuration*

Both the '282 and the '482 Patent claims require an "interface device," such as a "gateway device," positioned between a circuit switch network and a broadband network. '282 Patent at 7:37–8:5; '482 Patent at 8:28–38. The '282 and '482 Patents explain that resources of the circuit switched network can become unnecessarily taxed if relied upon to route every call, including voice calls originating and terminating in the broadband network. '482 Patent at 1:45–46 ("This reliance on a switch that resides in the PSTN is undesirable because the Class 5 switch is accessed for each voice call, even if the voice call originates and terminates in the broadband network."). As a result, the interface device claimed in the '282 and '482 Patents determines a path on a call-by-call basis. (Dkt. No. 359 at 54:18–55:19) If the path does not include the circuit switched network, the interface device offloads the call from the circuit switch. *Id.* ("[T]he call has to be routed via that path without using the circuit-switched network.").

Genband argues that there was substantial evidence for a reasonable jury to conclude that in order to meet the claim requirements of both (1) being "positioned between" a circuit switched network device, and (2) not using the circuit switched network device unless the path includes it, the accused products "would have to be configured to simultaneously connect to the class 5 switch and to the softswitch in such a way that calls from the alleged broadband device could be routed to either the softswitch or the class 5 switch depending on the path of the call." (Dkt. No. 383 at 10.) Genband argues that there was substantial evidence that neither Genband nor its customers use this dual configuration, referred to as "AGW/PLG," in the accused products. *Id.*

In response, Metaswitch contends that the accused products *are* configured "to simultaneously connect to the class 5 switch and to the softswitch." (Dkt. No. 388 at 4) ("To

13

operate as an AGW, by design, the accused products are configured to be positioned between a broadband network device (the uDLC) with RDT, and a circuit switched network device (the switch) with an IDT. These same products are also configured to operate as PLGs, including while simultaneously operating as AGWs." (citations omitted)). Metaswitch also argues that even if the accused products in the field are set up as either an AGW or PLG, but not both, the configuration is irrelevant because "[t]he evidence clearly establishes the accused products are configured to infringe" and "Genband would still infringe through testing of this functionality in the accused products." *Id.* While this Court recognizes that "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode," the language of the claims dictates whether an infringement has occurred. *Finjan, Inc. v. Secure Comput. Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010). The text of the asserted claims indicates that Genband's accused products must be "configured in a particular way to infringe." *Id.* Accordingly, the accused products must have been configured such that Genband could have tested the functionality of the products to operate as both PLGs and AGWs.

During trial, Dr. Burger, Metaswitch's expert, testified that Genband "test[s] their equipment," and concluded that Genband directly infringes by performing any claimed methods of the asserted patents. (Dkt. No. 356 at 47:10–20.) The Court notes that when Dr. Burger testified that Genband "test[s] their equipment" and "directly infringes on these claims," Dr. Burger was discussing infringement of the '273 Patent, not the '282 and '482 Patents. (Dkt. No. 356 at 46:22–47:24.) However, even if Dr. Burger's testimony applied to Genband's actions in the context of the '282 and '482 Patents, there was still substantial evidence for a reasonable jury to find that Genband did not test all claim limitations. (Dkt. No. 394 at 4.) For example, at trial, Genband introduced testimony from Bart Machester, Genband's Director of Development, who testified

that the current version of the G5 product does not support broadband subscribers despite the claim limitation requiring call routing from a "broadband device." (Dkt. No. 356 at 154.) Accordingly, Genband would not have been able to test the claimed feature in the G5 product. In addition, George O' Brien, Genband's Director of Engineering of Development, testified in his deposition that he was not aware of any Genband customer that chose to "perform the migration from the Class 5 switch to the softswitch" such that the G2 acted as an AGW and PLG simultaneously. (Dkt. No. 356 at 148:23–149:16.) This testimony, which was played by Metaswitch during trial, asserted that "[m]any customers choose to install the softswitch and the G2 and then migrate their legacy TDM equipment directly over to the PLG model so they don't have a transitional model where they're supporting both simultaneously." (Dkt. No. 356 at 149:7–16.) This jury was free to credit Mr. Machester's and Mr. Brien's testimony that neither Genband nor its customers infringed the '282 and '482 Patents such that the accused products were "configured to simultaneously connect to the class 5 switch and to the softswitch in such a way that calls from the alleged broadband device could be routed to either the softswitch or the class 5 switch depending on the path of the call." (Dkt. No. 383 at 10.) It is not the court's role, and in fact it is improper, for the Court to second guess the credibility determinations of the jury. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000).

### 2. *"Intercepting a call request"*

The asserted claims of the '482 and the '282 Patents require "intercepting a call request" from the broadband network device to the circuit switched network with the interface or gateway device. *See* '282 Patent at 8:6–14 ("intercepting a call request sent to a resource of the circuit switch network with the gateway device such that the gateway device determines whether to prevent the request from reaching the resource of the circuit switched network, wherein the call request is sent by an integrated access device (IAD) of the broadband network"); '482 Patent at

8:42–44 ("intercepting a call request sent by the broadband network device to the circuit switched network device"). Genband argues that the accused products do not "intercept a call request" because Genband products do not intercept call requests to determine whether to prevent them from reaching the circuit switched network. (Dkt. No. 383 at 10.) In response, Metaswitch argues that "[t]he accused products, at a minimum, stop or interrupt the progress of requests when they receive them." (Dkt. No. 376 at 17.)

However, there was substantial evidence from which a reasonable jury could properly find that the accused products do not stop or interrupt the progress of call requests because the G2, G6, and G5 calls from a broadband network device always go to the circuit switch. (Dkt. No. 359 at 60:12–61:4.) During trial, Mr. Stillerman, Genband's infringement expert, testified that the accused products do not "intercept call requests" because call requests to a circuit switch always go to the circuit switch regardless of whether the path includes the circuit switched network. (Dkt. No. 359 at 60:12–61:4 ("And the Genband products—and I'm showing both the G2, G6, or the G5—calls from a broadband network device always go to the circuit switch, so there's never any intercepting.").) In addition to Mr. Stillerman's testimony, Dr. Burger acknowledged that in other contexts, an interception prevents the object from reaching its intended destination. (Dkt. No. 356 at 136:6–15 (agreeing that in football, a completed pass to the intended receiver is not called an interception).) The Court concludes that a reasonable jury could properly be persuaded by Mr. Stillerman's testimony as opposed to that of Dr. Burger and conclude that Genband's accused products do not meet the "intercepting a call request" limitation.

### 3. "Determining a path by which to route the call"

The asserted claims of the '482 and '282 Patents require using the gateway or interface device to "determin[e] a path by which to route the call." '482 Patent at 8:43; '282 Patent at 8:15–16. Genband argues that there is substantial evidence that the accused products do not determine

a path to route the call because the accused products always rely on a switch to determine the call path. (Dkt. No. 383 at 12.) At trial, Mr. Stillerman testified that "in the access gateway configuration, all calls go to the Class 5 switch," and as a result, "[t]he path for determining where the call will actually go is done after the call gets to the Class 5 switch." (Dkt. No. 359 at 61:18–19.) For the PLG configuration, "all calls go to the softswitch. The path to the final destination is determined after the call goes to the softswitch." *Id.* at 62:3–9. Mr. Stillerman concluded that the G2, G6, and G5 products do not determine the path by which to route the call because in either case, the path is either determined by the Class 5 switch in combination with the rest of the telephone network, or by the softswitch. *Id.* at 62:14–63:5. As discussed in Section III.B.2., Genband contends that all calls are directed to the provisioned switch in the accused products, regardless of whether the call requires circuit switched resources. (Dkt. No. 383 at 12–14; Dkt. No. 356 at 154:18–155:4.) Accordingly, there was substantial evidence from which a reasonable jury could properly find that the accused products do not "determine a path by which to route the call" by concluding that the path is only determined after the call goes to the Class 5 switch or the softswitch.

### 4. The Accused Products Are Configured to Always Use a Circuit Switch

The asserted claims of the '482 and the '282 Patents require "intercepting a call request sent by the broadband network device" and using the gateway or interface device to determine a path by which to route the call such that resources associated with the class 5 network switch or the circuit switched network device and the circuit switched network "are not used unless the path includes the circuit switched network." '482 Patent at 8:43–47; '282 Patent at 8:26–32. During trial, Genband presented evidence that the accused G5 product does not support broadband subscribers and thus cannot intercept a call request sent by a broadband network device. (Dkt. No. 383 at 13; Dkt. No. 256 at 154:12–14 ("Q: Does the current version of the G5 support broadband

subscribers? A: No.").) In addition, Genband presented evidence that the accused G2/G6 products always use a circuit switch for calls from a broadband device, even if the path does not include the circuit switched network. (Dkt. No. 383 at 13.) Genband's corporate representative, Mr. O'Brien, corroborated this and testified that the accused G2 and G6 products always rely on the Class 5 circuit switch to route calls. (Dkt. No. 356 at 151:5–7). Following this logic, Mr. O'Brien concluded that the G2 and G6 products are not configured to route the call such that resources associated with the Class 5 circuit switch and the circuit switched network are not used unless the path includes the circuit switched network. *Id.*

Metaswitch argues that Genband only cited testimony regarding the "current version" of the G5—not "versions of the G5 that were still being tested and planned to be released." (Dkt. No. 388 at 5.) In addition, Metaswitch notes that Mr. O'Brien's testimony on the G6 and G2 products only addressed PLG functionality and did not address AGW functionality of the accused products that route calls to a softswitch. *Id.* However, Metaswitch offered no evidence that an unreleased version of the G5 or that a G2/G6 configured as an AGW/PLG operate any differently than the versions of the accused products about which Mr. Manchester and Mr. O'Brien testified. (Dkt. No. 394 at 5.) The patentee bears the burden of proving infringement by a preponderance of the evidence. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985). There was substantial evidence for a reasonable jury to find that the G5 does not support broadband subscribers and the G2 and G6 always use the circuit switch for calls from broadband devices, such that the accused products do not infringe the asserted claims of the '482 and the '282 Patents.

The Court denies Metaswitch's JMOL with respect to infringement of the '482 and the '282 Patents.

*5. Indirect infringement*

Indirect infringement can only arise in the presence of direct infringement. *Dynacore Holdings*, 363 F.3d at 1272. Metaswitch argues that Genband has induced its customers to infringe by promoting use of the infringing products through its product documentation and marketing materials. (Dkt. No. 376 at 17.) However, as discussed above in Sections III.B.1–4, there was substantial evidence that a reasonable jury could have relied upon to conclude that Metaswitch did not show by a preponderance of the evidence that the accused products directly infringe the asserted claims. (Dkt. No. 383 at 14.)

The Court denies Metaswitch's JMOL with respect to indirect infringement of the '482 and the '282 Patents.

### C. Judgment as a Matter of Law for Infringement of the '522 Patent

Metaswitch argues that the evidence showed that Genband directly and indirectly infringes Claims 10 and 14 of the '522 Patent through its C20 softswitch with integrated Experius Application Server (AS) and Gencom client software, specifically through the Genband "One Number" (or "Family Service") Solution feature. (Dkt. No. 376 at 17.) The '522 Patent generally discloses a method and apparatus for processing telephone calls in a packet-based telephony service. '522 Patent at 1:22–28.

*1. "a local exchange"*

Claims 10 and 14 of the '522 Patent require "a local exchange to connect a telephone associated with a multi-service user to a public-switched telephone network (PSTN) and to a packet-based telephony network." '522 Patent at 10:42–45, 12:25–28. Mr. Bress, Genband's expert witness, testified that the accused Genband products do not have a "local exchange." (Dkt. No. 360 at 7:5–11.) After reviewing "Genband's engineering documents," Mr. Bress concluded that "the C20 cannot be both a softswitch and a packet-based network and the local exchange.

Genband's system is a – packet-based network, and the C20 is the core. The heart of[] the packet-based network is the softswitch." *Id.* at 8:2–10.

Metaswitch argues that the C20 does "exist[] between two different networks, a circuit-switched network and a packet-switched network, and some of those internal components reside on the packet-based networks." (Dkt. No. 388 at 6; Dkt. No. 357 at 21:11–17.) Metaswitch contends that the C20 is made up of multiple components, "some of which reside on the circuit-switched network, and some of those internal components reside on the packet-based network." *Id.* at 21:11–17. Dr. Williams, Metaswitch's expert witness, testified that "the C20 exists in both networks," and consequently, because the C20 is connected to both the PSTN and the packet-based telephony network, the C20 is a "local exchange" resident in both networks. *Id.* However, Genband noted that Dr. Williams's deposition testimony contradicted his trial testimony. (Dkt. No. 357 at 47:23–50:23) ("Q. (By Mr. Schuneman) What I'd like to know, Dr. Williams, is if I read your answer correctly. Question: And is it not your opinion that the C20 part of the softswitch monitors incoming signaling information? The witness: Well, the act as a whole, so I think it is difficult to subdivide the two."). Despite the conflicting expert testimony, there was substantial evidence for a reasonable jury to accept Mr. Bress's testimony that the C20 cannot be a softswitch, a packet-based network, and the local exchange and disregard Dr. Williams's assertion that the C20 is a "local exchange."

> 2. *"calls are routed to the multi-service user by the PSTN without passing through the packet-based telephony network"*

Claims 10 and 14 of the '522 Patent requires that "calls are routed to the multi-service user by the PSTN without passing through the packet-based telephony network." '522 Patent at 10:53–57, 12:35–40. At trial, Mr. Bress testified that the accused Genband products do not infringe Claims 10 and 14 of the '522 Patent because the Genband's system cannot "route a call to a user

of the system without passing through a packet-based network." (Dkt. No. 360 at 8:11–10:7.) Mr. Bress explained that "all calls that come to this system have to go into this C20 softswitch and the C20 is the core of the packet-based network." *Id.* at 8:16–23. Accordingly, if "a caller is calling a GENCom client, . . . the call has to come to Genband's C20, which is in the packet-based network." (Dkt. No. 360 at 9:4–9.) Mr. Bress's testimony was corroborated by Dr. Williams's testimony, who admitted on cross examination that Genband's C20 softswitch is "a core element or a central element to that packet-based telephony network." (Dkt. No. 357 at 47:23–48:2.)

As discussed above, Metaswitch argues that the C20 is connected to both the PSTN and the packet-based telephony network, and as a result, this dual-existence allows the C20 to act as a "local exchange" in the PSTN that can route calls to a multi-service user by the PSTN without passing through the packet-based telephone network. (Dkt. No. 388 at 6–7.) However, every jury is free to "make credibility determinations and believe the witness it considers more trustworthy." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) (quoting *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000)). In light of the jury's determination that Metaswitch failed to prove infringement, the Court infers that the jury reasonably found Genband's experts to be credible and persuasive on this point. *Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 624 (5th Cir. 2008); *Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed. Cir. 1991). Considering Mr. Bress's testimony, there was substantial evidence supporting a factual finding that the C20 softswitch cannot (1) qualify as a "local exchange" or (2) "route calls to a multi-service user by the PSTN without passing through the packet-based telephony network."

The Court denies Metaswitch's JMOL with respect to indirect infringement of the '522 Patent.

**D. Judgment as a Matter of Law of Infringement of the '640 Patent**

Metaswitch argues that the evidence showed that Genband directly and indirectly infringes dependent Claim 8 of the '640 Patent. (Dkt. No. 376 at 22.) The '640 Patent generally describes a telecommunications network that is used for setting up a call between two endpoint telephone devices. '640 Patent at 1:5–25; (Dkt. No. 359 at 117:25–118:11). The '640 Patent discloses a method in which media gateway devices, also known as session border controllers ("SBCs"), coordinate to enable media bypass. '640 Patent at 26:14–47; (Dkt. No. 359 at 117:25–118:11).

> **1.** *"to enable bypass of said media gateway in said media path if an ensuing device in said outbound signaling path determines that such bypass should be conducted"*

Claim 1 of the '640 Patent, from which Claim 8 depends, discloses a method of enabling media bypass for a media gateway in a telecommunications network and recites in part:

> Including preceding device connectivity data in said outbound communication session setup request message, said preceding device connectivity data indicating at least one media connectivity setting for at least one preceding device which is located before said media gateway in said inbound signaling path, the at least one media connectivity setting identifying one or more other devices to which the preceding device is configured to be connectable in said media path, to enable bypass of said media gateway in said media path if an ensuing device in said outbound signaling path determines that such bypass should be conducted.

'640 Patent at 26:36–47. Genband argues that the accused QUANTiX SBCs do not "include preceding device connectivity data . . . to enable bypass of said media gateway in said media path if an ensuing device in said outbound signaling path determines that such bypass should be conducted." (Dkt. No. 383 at 20.) In its Claim Construction Order, this Court construed the "to enable bypass. . ." limitation to mean "based at least in part on the preceding device connectivity data, an ensuing device determines whether said media gateway should be bypassed." (Dkt. No. 136 at 28–30.) During trial, Mr. Bress testified that the QUANTiX SBCs could not infringe Claim 1, and accordingly dependent Claim 8, because there is no "ensuing device" to determine whether

to bypass an accused SBC. (Dkt. No. 359 at 122:1–123:22) ("And during his deposition, Mr. Shusta[, the Senior Director of SBC Engineering,] was presented with a hypothetical scenario where there's a single SBC between two endpoints, Endpoint A and B. And the question Mr. Shusta was asked: Would Endpoint B determine whether the SBC should or should not be in the media path? He said: It can't. It cannot make that determination."). Mr. Bress explained that, as discussed in Genband's operations guide for SBCs, the accused SBC itself makes the final determination on whether to directly route media for a particular call. *Id.* at 123:13–22 ("That means it's over. . . [N]o ensuing device can make a determination. The SBC itself makes the final determination."). The operations guide states that "the settings for both the source and the destination endpoint are considered before the SBC makes the final determination on whether to directly route media for a particular call." (Dkt. No. 383 at 21); DX–1287.0727. In addition to Mr. Bress's testimony, Nicholas Larkin, Metaswitch's 30(b)(6) witness and the named inventor on the '640 Patent, admitted at his deposition that he was unaware of any Metaswitch competitor product, including any Genband products, that practiced the multi-SBC media bypass method disclosed in the '640 Patent. (Dkt. No. 359 at 107:1–7, 122:1–13.)

In response, Metaswitch contends that the QUANTiX SBCs perform the "enable bypass" limitation because the claimed "ensuing device" could be either "the given device," in which the given device decides to bypass a previous device in the communications path, or at the "terminating endpoint," in which case the terminating endpoint decides to bypass any device preceding the terminating endpoint (i.e., any device in the communication path). (Dkt. No. 356 at 184:11–25) ("[F]or example, the '640 patent talks about the ensuing device being located at a given device, and the ensuing device can be – decide to skip itself or skip the previous device."). Under this logic, the accused QUANTiX SBCs would enable bypass of a preceding device by

23

"including the IP information into the outbound SIP invite message or not including that information." (Dkt. No. 356 at 185:4–6.) Alternatively, Metaswitch argues that the QUANTiX products would also infringe under the doctrine of equivalents because they perform substantially the same function in substantially the same way, and achieve substantially the same results. (Dkt. No. 376 at 24.) Specifically, Metaswitch notes that the accused products "implement the direct media routing feature using media routing settings from both preceding and ensuing devices," and as a result, "the ensuing device does in fact control the bypass determination." (Dkt. No. 388 at 8; Dkt. No. 356 at 184:11–25.)

However, Mr. Bress testified that the "source endpoint settings and destination endpoint settings" relate "to the two sides of the SBC itself," and that the settings on the SBC are taken into account in the QUANTiX SBCs "when it decides whether or not to route media." (Dkt. No. 394 at 6; Dkt. No. 360 at 31:9–32:4.) This testimony is consistent with Genband's position that the QUANTiX SBC cannot bypass an "ensuing device" because the SBC itself makes the final determination on whether to directly route media for a particular call. (Dkt. No. 359 at 123:9–124:7.) In addition, Genband argues that the accused QUANTiX SBCs do not infringe the '640 Patent under the doctrine of equivalents because (1) Metaswitch's infringement argument would "wrongly eliminate the ensuing device . . . from the claim"; (2) the QUANTiX SBCs use a substantially different way to make a bypass determination than the '640 Patent; and (3) Metaswitch's doctrine of equivalents theory would wrongly "cover . . . self-bypass, which . . . Mr. Larkin for Metaswitch said . . . was known for a long time before the '640 Patent." (Dkt. No. 359 at 12:1–6, 127:1–25, 128:1–11); *see also Warner-Jenkinson*, 520 U.S. at 29. "In case[s] of conflicting expert testimony, the jury is entitled to make credibility determinations and believe the witness it considers more trustworthy." *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000). This

Court finds that there was substantial evidence for a reasonable jury to find non-infringement of the '640 Patent.

The Court denies Metaswitch's JMOL with respect to infringement of the '640 Patent.

### E.  Validity of the '273 Patent

At trial, Genband argued that the '273 Patent was obvious and anticipated in light of the Nortel Milton reference and the Sylvain reference. (Dkt. No. 359 at 37:7–54:6.) The jury found that Genband proved by clear and convincing evidence that Claims 18, 24, and 27 of the '273 Patent were invalid. (Dkt. No. 348 at 3.) Metaswitch argues that Genband failed to meet its burden of introducing proof that either of these references invalidated the asserted claims of the '273 Patent. (Dkt. No. 376 at 26.)

#### 1.The Nortel Milton System

At trial, Genband argued that the Nortel Milton system invalidated Claims 18, 19, 24, and 27 of the '273 Patent. (Dkt. No. 359 at 37:7–46:18.) The Nortel Milton system includes a method of bypassing the control and switch matrix by converting the line and trunk frames of a telephone switch and inserting a remote terminal. *Id.* at 39:4–10 (testifying that the Nortel Milton system "allows [] the line and trunk frames of a Nortel DMS-100 to be converted where the [] company control and switch matrix of the DMS-100 are bypassed, and a remote terminal is inserted, and the brains of the Nortel DMS-100 are [] no longer used and customers, live users will receive service from another brain, another common control and switch matrix."). After reviewing Nortel's business records and engineering documents, including documents detailing cable connections and equipment layouts, Mr. Stillerman concluded that the Nortel Milton system anticipates Claims 18, 19, and 27 of the '273 Patent. *Id.* at 37:7–45:15. A claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001) (quoting *Celeritas Techs. Ltd. v.*

*Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed. Cir. 1998)). Mr. Stillerman used examples from an installation guide, provisioning and cabling documents, and floor plans, to explain how each limitation of Claim 27 is met by the Nortel Milton system. (Dkt. No. 383 at 26; Dkt. No. 359 at 43:3–44:25). After Mr. Stillerman finished his limitation-by-limitation analysis of Claim 27, he testified that those limitations from Claim 27 which are also disclosed in Claims 18 and 19 are similarly anticipated by the Nortel Milton system. (Dkt. No. 359 at 45:1–9.) Mr. Stillerman noted that unlike Claim 27, Claim 18 includes "trunk interfaces." *Id.* at 45:10–12. However, Mr. Stillerman testified that the Nortel Milton system also connected to trunk interfaces, and accordingly, Claims 18 and 19 are fully disclosed by the Nortel Milton system. *Id.* at 45:13–15.

Mr. Stillerman also testified that Claim 24 of the '273 Patent was obvious in light of the Nortel Milton system and the knowledge of a person having ordinary skill in the art. A patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). However, all patents are presumed to be valid. 35 U.S.C. § 282. Consequently, a party seeking a judgment that a patent is obvious bears the burden of demonstrating by clear and convincing evidence that the teachings of the prior art would have suggested the claimed subject matter to one of ordinary skill in the art. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000). Mr. Stillerman stated that Claim 24 includes "all elements of Claims 18 and 19," but also requires the additional limitation "of requiring the steps of connecting a media gateway within the telecommunications network." (Dkt. No. 359 at 45:16–20.) Mr. Stillerman noted that the '273 Patent acknowledges that "all modern Class 5 switches and media gateways are able to operate as local terminals in GR-303 DLCs." (Dkt. No. 359 at 45:23–

46:6); '273 Patent at 4:6–8. From the specification, Mr. Stillerman testified that "it would have been obvious to . . . be able to use a GR-303 over that link and connect to a media gateway." (Dkt. No. 359 at 46:2–6.) David Smith, the inventor of the '273 Patent, corroborated Mr. Stillerman's testimony when he admitted that at the time of the invention, it was known "to connect the digital transmission facility to a media gateway." *Id.* at 46:7–18.

Metaswitch argues that Genband failed to introduce clear and convincing evidence that the Nortel Milton system invalidated Claims 18, 24, and 27 of the '273 Patent. (Dkt. No. 376 at 26.) Metaswitch contends that (1) Genband's expert "relied on mere floor plans of the room where the allegedly invalidating art may have existed and documents for which he only showed the cover page"; (2) Mr. Stillerman "merely stated that the 'same analysis' that applied to [Claim] 27 applies to [Claims] 18 and 19"; and (3) "Genband offered no explanation for how the mere existence of media gateways means that it would have been obvious to use them in the claimed manner." *Id.* at 26–27. However, Mr. Stillerman formed his opinion after reviewing hundreds of pages of Nortel business records and interviewing Nortel engineers that installed the Nortel Milton system. (Dkt. No. 394 at 9; Dkt. No. 359 at 85:2–17.) In addition to "floor plans," Mr. Stillerman also relied on the Nortel Milton system installation guide and documents detailing cable connections and equipment layouts. (Dkt. No. 359 at 37:7–45:15.) Mr. Stillerman also discussed the distinctions between Claim 27 and Claims 18 and 19. Mr. Stillerman testified that Claim 18, unlike Claim 27, includes "trunk interfaces," but concluded that Claims 18 and 19 are fully disclosed by the Nortel Milton system because the system also connected to trunk interfaces. *Id.* at 45:10–15. Finally, as discussed above, there was substantial evidence from which a reasonable jury could find that the media gateway in Claim 24 was obvious in view of the Nortel Milton system and the knowledge of a person having ordinary skill in the art. Mr. Stillerman explained that the digital transmission

facility between the Nortel Milton system and the Gatewood system "is essentially a DLC," and accordingly, based on the language of the '273 Patent, it would have been obvious to use a GR-303 DLC over that link and connect to a media gateway. *Id.* at 45:23–46:6.

2.*The Sylvain Patent*

Genband also argued at trial that the Sylvain Patent ("Sylvain") invalidated the asserted claims of the '273 Patent. Sylvain discloses a switching system interface that makes subscriber lines of the incumbent local exchange carrier available to competitors, and in so doing, "avoids using the switching matrix and common control of the ILEC Class 5 switch." (Dkt. No. 359 at 47:22–48:1.) Mr. Stillerman testified that Claims 18, 19, 24, and 27 were anticipated by Sylvain. *Id.* at 49:7–54:12.) During trial, Mr. Stillerman explained limitation-by-limitation how Sylvain anticipates Claim 27 of the '273 Patent. (Dkt. No. 359 at 49:7–52:6.) Although Metaswitch argues that Sylvain does not disclose the "bypassing a common control and switch matrix" claim limitation (Dkt. No. 376 at 27), Mr. Stillerman explained at trial that in Sylvain, "Connection 9 is not used when you're going to a [competitive local exchange carrier]." (Dkt. No. 359 at 51:9–11. Because the system does not use Connection 9 when connecting to a competitive local exchange carrier, the system bypasses the common control and switch matrix of the incumbent local exchange carrier. *Id.* at 51:12–15. Sylvain also discloses that traffic that should be routed to the competitive local exchange carrier service node is connected through a network connection that bypasses the common control and switch matrix. *Id.* at 51:18–52:6.

Mr. Stillerman explained during trial that Claims 18 and 19 were also anticipated by Sylvain, under the same analysis used for Claim 27. *Id.* at 52:7–14 ("I've used the same methodology as I did for the – the earlier discussion and the switch collapse. So what I've done is I've compared Claims 18 and 19 to the Claim 27, which I've just analyzed."). Like his analysis with the Nortel Milton system, Mr. Stillerman's analysis with respect to Sylvain considered the

line and trunk interfaces disclosed in Claims 18 and 19. *Id.* at 52:15–24. Mr. Stillerman noted that the '273 Patent discloses that Class 5 switches connect to trunk frames and that Figure 2 of the prior art includes line and trunk frames. *Id.* at 52:21–24. Mr. Stillerman concluded that the disclosure, Sylvain, and the knowledge of a person having ordinary skill in the art that a Class 5 switch interfaces with line and trunk interfaces invalidated Claims 18 and 19. *Id.* at 53:2–6.

Metaswitch contends that Mr. Stillerman's analysis of Claims 18 and 19 was "conclusory." (Dkt. No. 376 at 27.) The Court finds this argument unpersuasive. Mr. Stillerman provided more than a mere conclusion that Sylvain discloses the claim limitations. Although Mr. Stillerman testified to the jury that he used the same analysis when considering Claims 18 and 19 as he did when considering Claim 27, he also noted that the "only substantial difference" between Claims 18 and 19 and Claim 27 are the "line and trunk interfaces." (Dkt. No. 359 at 52:11–19.) Mr. Stillerman then explained how the line and trunk interfaces disclosed in Claims 18 and 19 are still invalid in light of Sylvain. *Id.* at 52:2–53:6 ("And we see the line and trunk frames in Figure 2 of the prior art disclosed in the '273 Patent."). When the jury considered the differences between Claim 27 and Claims 18 and 19, it was required to consider how a person having ordinary skill in the art would understand the text of '273 Patent and Sylvain, *see PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008), and the jury was entitled to accept and give weight to Mr. Stillerman's opinion on that matter.

Mr. Stillerman also testified that the media gateway in Claim 24 was obvious in view of Sylvain and the knowledge of a person having ordinary skill in the art. (Dkt. No. 359 at 53:7–54:6.) Mr. Stillerman explained to the jury that Sylvain discloses connecting to a media gateway, and as a result, Sylvain invalidated Claim 24. *Id.* at 53:17–54:6 ("And as you may recall on one of the earlier slides, I pointed out that the service nodes can be Class 5 switches or they can be media

gateways, and here I'm providing Sylvain at Column 5, Lines 47 to 52 where he explicitly, expressly says that CLECs can be voice switches, Internet service provider gateways, corporate network gateways, video gateways, they can be gateways."). It is undisputed that Sylvain connects competitive local exchange carrier calls without using the old common control and switch matrix. (Dkt. No. 394 at 9.) Accordingly, there was substantial evidence supporting the jury's finding that Sylvain discloses the limitations of Claims 18, 24, and 27.

The Court denies Metaswitch's JMOL with respect to invalidity of the '273 Patent.

### F. Validity of the '482 and '282 Patents

At trial, Genband argued that the asserted claims of the '482 and the '282 Patents were anticipated in light of U.S. Patent No. 6,289,097 ("Gregory"). (Dkt. No. 359 at 67:7–75:9.) The jury found that Genband proved by clear and convincing evidence that Claim 2 of the '282 Patent and Claims 6 and 7 of the '482 Patent were invalid. (Dkt. No. 348 at 3.) Metaswitch contends that Genband failed to meet its burden of proof that Gregory invalidated the asserted claims of the '482 and the '282 Patents. (Dkt. No. 376 at 28.)

#### 1. The Gregory Patent

At trial, Genband argued that Gregory invalidated Claim 2 of the '282 Patent and Claims 6 and 7 of the '482 Patent. (Dkt. No. 359 at 67:7–75:9.) Metaswitch argues that Genband failed to introduce clear and convincing evidence that the asserted claims of the '482 and '282 Patents are invalid because: (1) Gregory fails to disclose the "not using" resources limitation of the patents-at-issue; and (2) Gregory fails to disclose a "gateway device" as required by Claims 1 and 2 of the '282 Patent. (Dkt. No. 376 at 28.)

The asserted claims of both the '482 and '282 Patents require "not using" resources associated with the circuit switched network device and circuit switched network unless the path includes the circuit switched network. '482 Patent at 8:43–47; '282 Patent at 8:27–32. Metaswitch

argues that Gregory fails to disclose the "not used" limitation of the '482 and '282 Patents because "the resources of the circuit switched network are used regardless of whether the path includes the circuit switched network or not." (Dkt. No. 376 at 28); '097 Patent at 5:21–45. However, the embodiment described in Gregory is just one example in which the circuit switch receives a message indicating that the call was redirected to a computer network. '097 Patent at 4:48–5:62 ("In an illustrative embodiment, . . . ."). Genband argues that the message sent to the circuit switch is optional because the message is a limitation of Claim 6 in Gregory, but not present in Claim 1, from which Claim 6 depends. *Id.* at 11:50–67, 12:9–14. In addition, Mr. Stillerman testified that Claim 1 in Gregory is "important because the resources associated with the circuit switched network are not used." (Dkt. No. 359 at 72:25–74:3.) There was substantial evidence at the trial for a reasonable jury to conclude that Gregory disclosed the "not used" limitations of the '482 and '282 Patents.

Metaswitch also argues that Gregory fails to disclose a "gateway device" as required by Claims 1 and 2 of the '282 Patent. (Dkt. No. 376 at 28.) Metaswitch notes that the Gregory specification distinguished between a "gateway" and a "repeater" in the language used within the patent. (Dkt. No. 359 at 95:13–18). For a prior art reference to anticipate under 35 U.S.C. § 102, every element of the claimed invention must be identically shown in a single reference, but anticipation "is not an 'ipsissimis verbis' test." *In re Bond*, 901 F.2d 831, 832 (Fed. Cir. 1990) (quoting *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1479 n.11 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909 (1987)). Mr. Stillerman testified that Gregory discloses a redirect repeater that performs all of the functionality required of the gateway claimed in the '282 Patent. *Id.* at 67:6–75:9, 94:14–20 ("A. It's my opinion that this repeater performs as a repeater, and it also performs as a gateway. And in particular, that this apparatus . . . which Gregory calls a

repeater, performs the functions of the intelligent gateway of the '482 and the '282 patents."). *See also In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986) ("[A]nticipation is a fact question subject to review under the clearly erroneous standard.").

In addition, although Mr. Stillerman did not identify an example outside of Gregory in which a "repeater" is considered to be a "gateway," an expert witness is not required to recall all instances or references that may support his testimony. *Id.* at 95:19–96:14. Metaswitch did not call any validity expert at trial to rebut Mr. Stillerman's testimony. (Dkt. No. 383 at 28.) It is the jury's role to weigh the evidence presented and judge the credibility of the witnesses. A reasonable jury could have concluded that Gregory disclosed the "gateway device" as required by Claims 1 and 2 of the '282 Patent based on Mr. Stillerman's testimony.

The Court denies Metaswitch's JMOL with respect to invalidity of the '482 and '282 Patents.

## G. Motion for a New Trial

Metaswitch contends that the jury's verdict is against the great weight of evidence, and as a result, a new trial is warranted. *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 461 (Fed. Cir. 2016) (quoting *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 270 (5th Cir. 1998)). Metaswitch claims that (1) there was no evidence to support the finding that Metaswitch's patents are invalid and not infringed; and (2) the jury failed to follow the Court's instructions and entered an "arbitrary and anti-patent verdict." (Dkt. No. 376 at 29.)

### 1. Weight of the Evidence

Metaswitch argues that even if the Court "find[s] that *some* minimal evidence supports the jury's verdict," a new trial should be granted because the evidence is significantly outweighed by the evidence that Metaswitch's patents are valid and infringed. *Id.* at 28–29. The Court finds this argument unpersuasive. The Court has already discussed extensively the substantial evidence

presented at trial, from which a reasonable jury could have properly reached its conclusions as to non-infringement and invalidity of the asserted claims in Metaswitch's patents-at-issue. *See supra* Sections I.A–F. Ultimately, the decision as to whether a new trial should be granted is within the discretion of the trial court. *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1333 (Fed. Cir. 1999). The Court concludes that the verdict is not against the great weight of the evidence, and declines to order a new trial.

### 2. *"Arbitrary and Anti-Patent Verdict"*

After a four-day trial, the jury deliberated for almost three and a half hours before reaching a unanimous verdict of non-infringement on fourteen claims and invalidity on nine claims from three of Metaswitch's patents and three of Genband's patents. (Dkt. No. 348; Dkt. No. 350 at 2; Dkt. No. 351 at 1.) Despite an instruction in the verdict form to answer the questions on damages for each patent "only if [the jury] found at least one claim of a patent valid . . . and the same claim of that patent infringed," the jury indicated "zero" for all damages. (Dkt. No. 348 at 4, 6.) Based solely on "the verdict and the length of deliberations," Metaswitch concludes that the jury entered an "arbitrary, anti-patent verdict" and that "there has been a prejudicial failure by the jury to follow the court's instructions." (Dkt. No. 376 at 29–30.)

Metaswitch's assertion that the verdict and the "short length of deliberations" established an "arbitrary and capricious anti-patent verdict" is unavailing. There is no "minimum deliberation time" required before a jury may reach a verdict. *See U.S. v. Holloway*, 166 F.3d 1215 (Table) (6th Cir. 1998) (declining to enforce a minimum time limit for deliberation and noting that "[p]resumably, the minimum time limit would vary depending on the co-defendants, the tally of different issues, and the complexity of each issue. This subject seems ill suited for judicial micromanagement."). Furthermore, at no point did this Court limit the jury's deliberations or suggest that verdict must be reached by a certain time. *See Witco Chem. Corp. v. Peachtree Doors,*

*Inc.*, 787 F.2d 1545, 1548–49 (Fed. Cir. 1986) (vacating and remanding the case for a new trial where, after the jury found the patents enforceable but remained at an impasse as to infringement, the judge excused the jury indefinitely subject to recall, only to recall the jury six weeks later to deliberate over the infringement questions); *Lucas v. Am. Mfg. Co.*, 630 F.2d 291 (5th Cir. 1980) (granting a new trial where the trial judge put a time limitation on the jury deliberations in view of an approaching hurricane). To have done so, in fact, would have been clearly erroneous.

In addition, under Metaswitch's logic, any unanimous verdict of non-infringement and invalidity returned under four hours is "a uniformly anti-patent verdict." (Dkt. No. 376 at 29–30.) This is unavailing. The Court declines to ignore the appropriately substantial deference to be afforded to the jury's ultimate decisions simply because in Metaswitch's opinion, the jury should have deliberated for a longer period of time. *See, e.g., Mejia v. Cook County, III*, 650 F.3d 631, 633 n.1 (7th Cir. 2011) ("The district court's power to grant a new trial on weight grounds is not unlimited: a certain deference to the jury's conclusions is appropriate.").

Finally, although the verdict form did instruct the jury not to answer the verdict questions on damages unless the jury found at least one claim of a patent both valid and infringed, the jury's actions did not amount to the "prejudicial failure" or "abuse of discretion" as Metaswitch suggests. (Dkt. No. 36 at 29.) For example, in *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, one of the cases from which Metaswitch relies, the district court conditionally granted a new trial after the counsel defied the court's direction not to raise certain issues pertaining to liability in its closing argument. 848 F.2d 613, 619 (5th Cir. 1988). The district court's conditional grant, which was reversed on appeal by the Fifth Circuit because the opposing counsel waived any objection to the impropriety of the closing argument and the district court judge subsequently issued specific instructions, resulted from inflammatory and disallowed comments made during a closing

argument—this is a very far cry from the jury's conduct here. *Id.* at 620. *See also Vezina v. Theriot Marine Serv., Inc.*, 554 F.2d 654, 655–56 (remanding the case for an evidentiary hearing in the district court where a juror failed to disclose during voir dire examination that she and her husband had pending against them a $500,000 personal injury suit); *McIver v. Am. Eagle Airlines, INc.*, 413 Fed. App'x 772, 776 (5th Cir. 2011) (unpublished) (affirming the district court's decision to *sua sponte* grant a new trial after a juror told the court that he believed the defendant's witness was being coached by a member of the audience because the witness "never looked at the jury" while the plaintiff did not follow the court's instructions not to look at the jury while testifying and "was on the stand doing what he could to infatuate the jury with him").

The jury's actions closely parallel the actions of the jury at issue in *White v. Grinfas*, where all the questions subject to question 3 on the verdict form were predicated on an affirmative response to question 3. 809 F.2d 1157, 1161 (5th Cir. 1987). Although the jury in *White* answered subsequent questions to question 3 despite a negative response to question 3, the trial court entered judgment against the appellants. *Id.* On appeal, the Fifth Circuit agreed that "the subsequent answers had to conflict with the answer to question 3, regardless of whether they were also in conflict with each other." *Id.* However, the Fifth Circuit held that "if the district court has correctly found that the jury's answer to a question that was supposed to terminate further inquiry is clear and disposes of the legal issues, on review we must ignore the jury's necessarily conflicting answers to any other questions." *Id.* The Fifth Circuit concluded that "[t]he subsequent questions are by definition irrelevant in these circumstances, and cannot be used to impeach the jury's clear verdict" and affirmed the district court's judgment. *Id.* Although the jury should not have answered

the damages section of the verdict form, the jury's finding of non-infringement is clear and disposes of the damages issues.[2]

The Court denies Metaswitch's motion for a new trial.

**IV. GENBAND'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON ISSUES NOT EXPRESSLY DECIDED BY THE JURY AND FOR DISMISSAL WITH PREJUDICE OF METASWITCH'S LICENSE DEFENSES**

### A. Judgment as a Matter of Law for Metaswitch's License Defenses

In its Answer and First Amended Counterclaims, Genband accused Metaswitch's Multiservice Telephony Application Server ("MTAS") of infringing Claim 15 of U.S. Patent No. 8,600,006. (Dkt. No. 75 at 29–30.) Before trial, and as an affirmative defense to Genband's claims, Metaswitch argued that (1) Metaswitch was entitled to a royalty-free license under the CableLabs IPR Agreement and (2) Metaswitch had a FRAND license under the IETF and ITU standards bodies ("license and standards defenses"). (Dkt. No. 74 at 17–23.) Metaswitch maintained its defenses in the joint pre-trial order filed in this case. (Dkt. No. 231 at 2–5.) On March 11, 2016 at 12:34 a.m., Metaswitch's counsel emailed Genband's counsel with its prior art election, but did not include any standards despite an agreement between the parties that they would be exchanging "both prior art and standards." (Dkt. No. 340, Ex. A, M. Kaplan Email 3.11.16) On the morning of March 11, before the beginning of the first day of trial but after jury selection, Genband's counsel asked Metaswitch's counsel to confirm that Metaswitch would not be presenting any standards at trial. *Id.* At 1:11 p.m., Metaswitch's counsel confirmed that Metaswitch "was not going forward with any standards at trial." *Id.* On March 15, 2016, Genband presented evidence

---

[2] The Court notes that the jury's answers of "zero" for the damages questions are consistent with its liability findings. If an accused party does not infringe a patent, the patentee receives "zero" damages. The Court suspects the jury inserted these "zero" answers to the damages questions merely as their way to reiterate their "no" answer to the liability questions. This conduct is not in any manner inconsistent with the remainder of the verdict.

for its '006 Patent infringement argument. (Dkt. No. 360 at 122:19–133:4.) Metaswitch did not present any evidence or argument on its license and standards defenses.

Genband argues that Metaswitch's license and standards defenses should be dismissed with prejudice because "no reasonable jury could have found for Metaswitch on its license defenses due to Metaswitch's complete failure to present any evidence." (Dkt. No. 371 at 4.) Genband insists that Metaswitch's decision to drop its license and standards defenses is not the type of "voluntary case narrowing" encouraged by the Court, but instead, a case "where a party has manifestly expressed its intent to litigate a claim in a way that gives rise to a continuing case or controversy and requires that the claim be dismissed with prejudice if the party attempts to withdraw it." (Dkt. No. 379 at 1) (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-00911-JRG-RSP, Dkt. No. 376, at *4 (E.D. Tex. Feb. 14, 2016)).

In response, Metaswitch argues that notification by a party that it is no longer pursuing a claim or defense is akin to a Rule 15 amendment to the pleadings or a Rule 41(a) dismissal without prejudice. *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1353 (Fed. Cir. 2012). In addition, Metaswitch notes that the parties did not actually litigate Metaswitch's license and standards defenses at the jury trial. (Dkt. No. 380 at 1.) Accordingly, Metaswitch concludes that entry of judgment would not be appropriate. *Id.* (citing Restatement (Second) Judgments § 27(e) (1982) ("A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.")).

This Court, consistent with the holdings of other courts, does not penalize such attempts to narrow issues by entering judgment on issues not presented at trial. *VirnetX Inc. v. Apple Inc.*, 925 F. Supp. 2d 816, 849 (E.D. Tex. 2013). The Court finds that the facts present in this case closely parallel the situation in *Alcon Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180 (Fed. Cir.

2014). In *Alcon*, the plaintiff informed the defendant of its decision to drop its claims involving the '383 and '052 Patents before the pre-trial conference. *Id.* at 1192. During trial, neither party put forward any evidence on the merits of infringement or validity of the contested patents. *Id.* In addition, the plaintiff did not "formally obtain[] a dismissal of the claims involving those patents from its complaint prior to trial." *Id.* On appeal, the Federal Circuit affirmed the district court and held that the district court correctly denied the defendant's motion for affirmative judgment that the '383 and '052 Patents were not infringed. *Id.* at 1192–93 The Federal Circuit noted that the district court properly assessed both what the parties expected to try given their statements and conduct and what they actually litigated at trial. *Id.* "The scope of any judgment should conform to the issues that were actually litigated." *Id.* at 1193. Like the plaintiff in *Alcon*, Metaswitch notified Genband before Genband's '006 Patent infringement argument that it would not be presenting any standards at trial. (Dkt. No. 340, Ex. A, M. Kaplan Email 3.11.16.) Although Metaswitch's defenses were listed in the pre-trial order and Metaswitch did not drop its defenses until the first day of trial, (Dkt. No. 374 at 1–2), the fact remains that Metaswitch's defenses were not "litigated, or fairly placed in issue, during the trial." *Alcon Research*, 745 F.3d at 1193 ("A court should not render judgment with respect to claims 'reference[d] in the complaint' but not raised in the pretrial statement *or* litigated at trial.") (emphasis added). *See also SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1353 (Fed. Cir. 2012) (notification by plaintiff that it was no longer pursuing claims "akin to either a Federal Rule of Civil Procedure 15 amendment to the complaint . . . or a Rule 41(a) voluntary dismissal of claims without prejudice"); *Streck, Inc. v. Research & Diagnostic Sys.*, 665 F.3d 1269, 1284 (Fed. Cir. 2012) (withdrawn claims did not present an Article III "case or controversy," and therefore fell outside the Court's jurisdiction).

The Court denies Genband's motion for judgment as a matter of law for dismissal with prejudice on Metaswitch's standards or licenses defenses.

### B. Judgment as a Matter of Law that the '273 Patent is Not Enabled and is Therefore Invalid and Judgment as a Matter of Law on Damages for Metaswitch's Patents

Genband represents that if the Court maintains its judgment for Genband on Metaswitch's infringement claims, Genband believes this motion, as to enablement and damages, may properly be denied as moot. Having already considered and denied Metaswitch's JMOL with respect to infringement of the '273 Patent, Genband's JMOL with respect to invalidity of the '273 Patent is denied as moot. In addition, Genband's JMOL with respect to damages for Metaswitch's patents is Denied as Moot.

## V. GENBAND'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

### A. Judgment as a Matter of Law for the '667 Patent

Genband moves for judgment as a matter of law that Metaswitch's accused products infringe Claim 6 of the '667 Patent. (Dkt. No. 377 at 8.) The invention claimed in the '667 Patent describes a system and method for interfacing telephony voice signals with a broadband access network that substantially eliminate or greatly reduce disadvantages and problems associated with conventional telecommunications systems. '667 Patent at 1:45–52. Metaswitch argues that the jury was well-justified in finding non-infringement in view of Genband's failures of proof because (1) the accused products do not have a telephony port module that includes digital signal processors and a telephone network interface; and (2) Genband's expert witness failed to identify a structure for the "access network module" limitation. (Dkt. No. 384 at 7–8.)

*1. "telephony port module" that includes "digital signal processors" and "an interface to a telephone network"*

Claim 6 of the '667 Patent discloses a gateway system for interfacing telephony signals with a broadband access network and requires "at least one telephony port module operable to interface with a public switched telephone network, the telephony port module including a plurality of digital signal processors operable to perform processing functions on telephony signals received from either the broadband access network or the public switched telephone network." '667 Patent at 7:29–35. In its Claim Construction Order, this Court further construed "telephony port module" to mean "an interface to a telephone network." (Dkt. No. 136 at 76.) During trial, Metaswitch's expert, Dr. Madisetti, testified that the accused products do not infringe Claim 6 because the accused products do not have a telephony port module that includes digital signal processors ("DSPs") *and* a telephone network interface. (Dkt. No. 361 at 51:4–55:1.) Dr. Madisetti explained that the front module, the [resource card] DX blade from Metaswitch's products, "has DSPs but no interface." *Id.* at 52:7–53:21. Conversely, the rear transition module from Metaswitch's products "has no DSPs, but it has an interface." *Id.* Accordingly, Dr. Madisetti concluded that Metaswitch's products did not meet the "digital signal processors" *and* "interface to a telephone network" limitation of Claim 6. *Id.* at 54:20–55:1.

Genband argues that Metaswitch's products do meet this limitation because Dr. Madisetti conceded that "a telephony port module, as construed by the Court, may be a combination of components on two different cards." *Id.* at 76:17–24. Genband reasons that the combination of the DX blade with the DSPs and the rear transmission module which includes an "interface" would constitute a "telephony port module" as disclosed in Claim 6 of the '667 Patent. (Dkt. No. 377 at 10.) However, during trial, Dr. Madisetti explained that Genband's infringement expert, Mr. Lanning, inappropriately combined the two elements to show "the presence of a telephony port

module." (Dkt. No. 361 at 54:16–19) ("[Mr. Lanning] has erased a portion of the block called TPM and combined it with a block called VPM. And he calls that a telephony port module. And respectfully, I disagree with this, and I believe he has made a mistake."). Dr. Madisetti further testified on cross-examination that the "particular combination" of the DX blade and the rear transition module "is not what one of ordinary skill in the art would understand to be the telephony port module." *Id.* at 80:24–81:19. Dr. Madisetti noted that Dr. Beckmann, Genband's expert witness in a related patent case between Metaswitch and Genband, "agree[d] with [Dr. Madisetti] as well that the combination of the DX blade and the RTM would not constitute a module, the telephony port module." *Id.* at 78:3–79:11. The Court finds that there was substantial evidence from which a reasonable jury could conclude that Metaswitch's accused products did not have the combination of digital signal processors and an interface to a telephony network to constitute a telephony port module.

### 2. *"access network module" structure*

Claim 6 of the '667 Patent requires an "access network module" operable to interface with the broadband access network. '667 Patent at 7:27–28. In its Claim Construction Order, this Court construed "access network module" as a means-plus-function term, with a corresponding structure of "access network module 100, and equivalents thereof." (Dkt. No. 136 at 79.) Metaswitch argues that its accused products do not meet the "access network module" limitation because Genband's infringement expert, Mr. Lanning, failed to identify a structure for the "access network module" limitation. (Dkt. No. 384 at 8; Dkt. No. 361 at 55:5–56:25.) During the trial, Mr. Lanning testified that the "access network module 100" structure includes the "OCTAL 10/100BT," which is "an Ethernet type connection" used to connect to the Internet. (Dkt. No. 360 at 62:23–63:7.) Mr. Lanning testified that Metaswitch's accused products have an "access network module" as claimed

because they include "auto-detecting fast/gigabit Ethernet" which is equivalent to the OCTAL 10/100BT structure. (Dkt. No. 63:22–64:6.)

However, Dr. Madisetti explained that Mr. Lanning did not show the structure. (Dkt. No. 361 at 56:5–8.) According to Dr. Madisetti, Mr. Lanning only "identified a backplane Ethernet and said that that is the access network module." *Id.* ("[H]e has not provided any evidence as to structure, in my opinion.") Metaswitch argues that because Mr. Lanning merely testified that the accused products have an Ethernet interface, but failed to identify the physical structure to provide that interface, he also failed to testify that any such structure would be the same as the structure required under the Court's construction. (Dkt. No. 384 at 8.) The Court finds that there was substantial evidence from which a reasonable jury could conclude that Metaswitch's accused products did not include the "access network module" limitation of Claim 6 of the '667 Patent.

The Court denies Genband's motion for judgment as a matter of law for infringement of the '667 Patent.

### B. Validity of the '667 Patent

At trial, Metaswitch argued that the asserted claims of the '667 Patent were anticipated in light of either (1) the Natural Microsystems ("NMS") CG 6000C and (2) U.S. Patent No. 6,237,047 to Peebles ("Peebles"). (Dkt. No. 377 at 3.) The jury found that Metaswitch proved by clear and convincing evidence that Claim 6 of the '667 Patent is invalid. (Dkt. No. 348 at 5.) Genband contends that Metaswitch failed to meet its burden of introducing clear and convincing evidence that the CG 6000C or Peebles invalidated the asserted claims of the '667 Patent. (Dkt. No. 377 at 3.)

By reviewing installation and developer's manuals for the CG 6000C and other documents, Dr. Madisetti concluded that the CG 6000C was a product sold in early 2000, before the priority date of the '667 Patent, and was a gateway "just like [the gateway disclosed in] the '667." (Dkt.

No. 361 at 57:24–58:19.) Dr. Madisetti testified that the CG 6000C "was known, made, used, and sold before the '667 Patent." *Id.* at 59:15–17. In addition, Dr. Madisetti explained that every limitation of Claim 6 was disclosed in the CG 6000C. *Id.* at 60:6–62:8. Genband argues that a reasonable jury could not have found invalidity because Mr. Paul Flagg, a former NMS employee, testified that the CG 6000C could not "assign telephony signals to any digital signal processor," as required by Claim 6, but only to a subset of such digital signal processors. (Dkt. No. 377 at 4.) Genband draws a distinction between a "subset" of DSPs, and an individual DSP. *Id.* at 4–5. However, Metaswitch argues that Dr. Madisetti addressed Mr. Flagg's testimony, explaining that the CG 6000C references discloses a "pool of 16 DSPs," and that "a pool is a resource that one of ordinary skill in the art would understand you can map to any DSP." Metaswitch notes that Genband's argument highlights a disputed issue of fact. The Court agrees. Even if Mr. Flagg's understanding was contrary to Dr. Madisetti's, the jury is entitled to credit or discredit testimony before it. *Star Sci*, 655 F.3d at 1378. There was substantial evidence from which a reasonable jury could find that the CG 6000C anticipated Claim 6 of the '667 Patent.

In addition, during trial, Metaswitch argued that Peebles anticipated Claim 6 of the '667 Patent. Peebles discloses a system related to an improved technique of implementing distributed voice, media, and data processing systems in a networked environment. '047 Patent at 1:11–15. Dr. Madisetti explained that Peebles, which has a priority date that predates the '667 Patent, meets each and every element of Claim 6 of the '667 Patent. (Dkt. No. 361 at 62:11–64:11.) Genband argues that Peebles fails to disclose a "telephony port module operable to assign telephony signals to *any digital signal processor* of the telephony port module," as required by Claim 6. (Dkt. No. 377 at 5.) Although Dr. Madisetti testified that Peebles discloses the DSP limitation because Peebles indicates that "the signal processing functions can be implemented by any of the

processing cards," (Dkt. No. 361 at 63:19–25), Genband notes that the portion of Peebles relied upon by Dr. Madisetti is silent as to whether any digital signal processor on those cards can perform the "signal processing functions." (Dkt. No. 377 at 5–6); '047 Patent at 3:54–57. However, Peebles also states that "the signal processing functions are implemented by any of the processing cards," and Dr. Madisetti explained to the jury that Pebbles explicitly disclosed the "any DSP" limitation in at least two different sections. (Dkt. No. 361 at 63:1–25); '047 Patent at 3:55–57. In his presentation, Dr. Madisetti linked the "any digital signal processor" limitation to the "any of the processing cards" reference in Peebles. *Id.* at 63:9–25 ("[A]s I've shown with the highlight, that the signal processing functions can be implemented by any of the processing cards, and functions are typically implemented on the DSP inside the cards."). In addition, Dr. Madisetti explained that the "control processor" described in Figure 3 of Peebles "controls the flow" of information to the individual DSPs, which sufficiently meets the "any DSP" limitation. *Id.* at 63:5–17. The Court holds that there was substantial evidence from which a reasonable jury could find that Peebles anticipated Claim 6 of the '667 Patent.

The Court denies Genband's motion for judgment as a matter of law for validity of the '667 Patent.

### C. Validity of the '252 and '210 Patents

At trial, Metaswitch argued that the asserted claims of the '252 and the '210 Patents were anticipated in light of two prior art references: Abbot and Carney. (Dkt. No. 361 at 68:15–17.) The jury found that Metaswitch proved by clear and convincing evidence that Claim 1 of the '252 Patent and Claim 1 of the '210 Patent are invalid. (Dkt. No. 348 at 5.) Genband contends that Metaswitch failed to meet its burden of introducing clear and convincing evidence that Abbot and Carney invalidated the asserted claims of the '252 and '210 Patents. (Dkt. No. 377 at 3.)

Both Claim 1 of the '252 Patent and Claim 1 of the '210 Patents recite a "switch proxy apparatus for controlling a remote terminal." '252 Patent at 10:16–30; '210 Patent at 12:55–60. Genband argues that a reasonable jury could not have relied on Abbot and Carney to invalidate the '252 and '210 Patents because they fail to disclose the claimed "switch proxy apparatus for controlling a remote terminal" limitation. (Dkt. No. 377 at 7.)

During trial, Dr. Madisetti testified that Abbott, a reference regarding the AT&T 10A RSS switch with built-in ESA functionality, discloses a "stand-alone" feature that controls the remote terminal such that it "automatically transfers to a standalone mode which provides basic telephone service between stations connected to the remote switching unit." (Dkt. No. 361 at 69:3–8.) Dr. Madisetti explained that this "stand-alone" feature is the switch proxy. *Id.* Dr. Madisetti also testified that Carney, a reference regarding the AT&T 5ESS switch with remote switching module (RSM), discloses a switch proxy that controls the remote system so that "[i]n the rare event of a total transmission failure, the RSM can process calls." *Id.* at 72:3–7. Genband argues that 10A RSS and the 5ESS switches cannot meet the "switch proxy" limitation because they cannot be both the claimed "switch proxy" and the "remote terminal." (Dkt. No. 377 at 7.) Genband contends that the claimed switch proxy apparatus and remote terminal are two different "entities," and accordingly, no reasonable jury could conclude that Dr. Madisetti's testimony that the 10A RSS remote switch is a switch proxy, or that the RSM of the 5ESS switch is a remote terminal. *Id.* at 8. However, Metaswitch notes, and the Court agrees, that the Claim Construction Order does not require the "switch proxy" to be physically separate or "outside" of the remote terminal. (Dkt. No. 136 at 61–62.) The Abbot reference states that "[a]n important feature of the 10A RSS in central office applications is its stand-alone operation in the event of data or voice transmission isolation from the host ESS," and Carney discloses a stand-alone mode where "the RSM provides access to

45

emergency services, such as police, that normally would be accessed through the host." (Dkt. No. 393 at 8.) Both Abbot and Carney disclose stand-alone functions that, according to Dr. Madisetti's testimony, serve as switch proxies and remote terminals with ESA functionality. *Id.* A reasonable jury could have relied on Dr. Madisetti's testimony to determine that the 10A RSS switch or the 5ESS switch fulfill both the "switch proxy" and "remote terminal" limitations.

The Court denies Genband's motion for judgment as a matter of law for validity of the '252 and '210 Patents.

### VI.   CONCLUSION

For the reasons set forth herein, Metaswitch's Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for a New Trial (Dkt. No. 376) is **DENIED**; Genband's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Dkt. No. 377) is **DENIED**; and Genband's Renewed Motion for Judgment as a Matter of Law on Issues Not Expressly Decided by the Jury and for Dismissal with Prejudice of Metaswitch's License Defenses (Dkt. No. 371) is **DENIED**.

**So ORDERED and SIGNED this 28th day of August, 2017.**


_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE